# IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO
### CIVIL DIVISION

| | | |
|---|---|---|
| **ROBERT MOUNCE,** | : | |
| 2396 PARABON MILL Drive | : | Case No. |
| BURLINGTON, KY 41005 | : | |
| | : | |
| | : | JUDGE Guckenberger |
| **Plaintiff,** | : | |
| | : | **COMPLAINT** |
| **v.** | : | **& JURY DEMAND** |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.,** | : | |
| Pakistan | : | |
| (Served via regular mail through | : | |
| the Hague Convention) | : | |
| | : | |
| And | : | |
| | : | |
| **CENTER FOR ADVANCED SPINE** | : | |
| **TECHNOLOGIES, INC.** | : | |
| (Served via regular mail through | : | |
| the Hague Convention) | : | |
| | : | |
| And | : | |
| | : | |
| **WEST CHESTER HOSPITAL, LLC** | : | |
| 7700 UNIVERSITY DRIVE | : | |
| WEST CHESTER, OH 45069 | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI, OH 45202 | : | |
| (Serve via Certified mail) | : | |
| | : | |
| And | : | |
| | : | |
| **UC HEALTH** | : | |
| SERVE: GH&R BUSINESS SVCS., INC. | : | |
| 511 WALNUT STREET | : | |
| 1900 FIFTH THIRD CENTER | : | |
| CINCINNATI,OH 45202 | : | |
| (Serve via Certified mail) | : | |
| | : | |
| And | | |

2015 06 1527

BUTLER COUNTY CLERK OF COURTS

1

**EXHIBIT A**

**MARGARET BUCHANON**                :
CINCINNATI ENQUIRER                  :
312 ELM STREET                       :
CINCINNATI, OH 45202                 :
(Serve via Certified mail)           :
                                     :
And                                  :
                                     :
**C. FRANCIS BARRETT**               :
BARRETT & WEBER LPA                  :
FOURTH & WALNUT CENTER               :
105 E. FOURTH ST., SUITE 500         :
CINCINNATI, OH 45202                 :
(Serve via Certified mail)           :
                                     :
And                                  :
                                     :
**JOSEPH BRODERICK, M.D.**           :
UC PHYSICIANS NEUROLOGY              :
222 PIEDMONT AVENUE                  :
SUITE 3200                           :
CINCINNATI, OH 45219                 :
(Serve via Certified mail)           :
                                     :
And                                  :
                                     :
**REV. DAMON LYNCH, JR.**            :
26 WEST NORTH BEND ROAD              :
CINCINNATI, OHIO 45216               :
(Serve via Certified mail)           :
                                     :
                                     :
**MYLES PENSAK, M.D.**               :
222 PIEDMONT AVE STE 5200            :
CINCINNATI, OH 45219                 :
(Serve via Certified mail)           :
                                     :
And                                  :
                                     :
**CREIGHTON B. WRIGHT. M.D.**        :
4030 SMITH RD # 300                  :
CINCINNATI, OH 45209                 :
(Serve via Certified mail)           :
                                     :
And                                  :

2015 07 1527

BUTLER COUNTY
CLERK OF COURTS

2

**JEFFREY WYLER**
401 MILFORD PKWY
MILFORD, OH 45150
(Serve via Certified mail)

And

**DR. HALEEM CHAUNDHARY**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**DR. DOUGLAS FEENEY**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**JAMES A. KINGSBURY**
UCMC-MT REID 119
234 GOODMAN ST.
CINCINNATI, OH 45219
(Serve via Certified mail)

And

**KEVIN JOSEPH**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**EDWARD CRANE, MD**
3050 MACK RD. #300
FAIRFIELD, OH 45014
(Serve via Certified mail)

And

**TOM DASKALAKIS**
7700 UNIVERSITY DRIVE

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

2015  07  1527

3

WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**JEFF DRAPALIK**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**PAULA HAWK**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**TIMOTHY KREMCHEK**
500 E. BUSINESS WAY
CINCINNATI, OH 45241
(Serve via Certified mail)

And

**RON ROHLFING**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)

And

**DAVID SCHWALLIE**
UCMC-MT REID 119
234 GOODMAN ST.
CINCINNATI, OH 45219
(Serve via Certified mail)

And

**JILL STEGMAN**
7700 UNIVERSITY DRIVE
WEST CHESTER, OH 45069
(Serve via Certified mail)



2015 07 1527

4

And                                          :
                                             :
**CAROL KING**                               :
7700 UNIVERSITY DRIVE                         :
WEST CHESTER, OH 45069                        :
 (Serve via Certified mail)                   :
                                             :
And                                          :
                                             :
**JULIE HOLT**                               :
7700 UNIVERSITY DRIVE                         :
WEST CHESTER, OH 45069                        :
(Serve via Certified mail)                    :
                                             :
And                                          :
                                             :
**NAVEED FAZLANI, MD**                        :
1380 COMPTON RD.                              :
CINCINNATI, OH 45231                          :
(Serve via Certified mail)                    :
                                             :
And                                          :
                                             :
**ELLIOTT FEGELMAN, MD**                      :
4760 E. GALBRAITH RD. #108                    :
CINCINNATI, OH 45236                          :
(Serve via Certified mail)                    :
                                             :
And                                          :
                                             :
**MATTHEW HARDIN, MD**                        :
3130 HIGHLAND AVE. FL.2                       :
CINCINNATI, OH 45219                          :
(Serve via Certified mail)                    :
                                             :
And                                          :
                                             :
**JERRY MAGONE. MD**                          :
1000 COLUMBUS AVE.                            :
LEBANON, OH 45036                             :
(Serve via Certified mail)                    :
                                             :
And                                          :
                                             :
**CYNDI TRAFFICANT**                          :
7700 UNIVERSITY DRIVE

5

WEST CHESTER, OH 45069                    :
(Serve via Certified mail)               :
                                         :
And                                      :
                                         :
**PATRICK BAKER**                        :
7700 UNIVERSITY DRIVE                    :
WEST CHESTER, OH 45069                   :
(Serve via Certified mail)               :
                                         :
And                                      :
                                         :
**JAMIE HUNTER**                         :
7700 UNIVERSITY DRIVE                    :
WEST CHESTER, OH 45069                   :
(Serve via Certified mail)               :
        **Defendants**                   :

Comes now the Plaintiff, Robert Mounce, and files this Complaint and jury demand and state as follows:

1. At all times relevant, Plaintiff was a resident of and domiciled in the State of Ohio.

2. At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3. At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4. At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

5. At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West

Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

6. At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7. UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8. The amount in controversy exceeds the jurisdictional threshold of this Court.

9. The subject matter of the Complaint arises out of medical treatment by Defendants in Butler County, Ohio. This Court is thus the proper venue to grant Plaintiff the relief sought.

## FACTUAL ALLEGATIONS OF PLAINTIFF

10. Plaintiff Robert Mounce first met Dr. Durrani at his CAST offices in June 2011.

11. At the time, Plaintiff was experiencing debilitating pain in his lower back and groin and numbness in his legs.

12. During Plaintiff's second consultation in June 2011 with Dr. Durrani, Dr. Durrani recommended that Plaintiff undergo surgery to correct his pain.

13. In October 2011, Dr. Durrani performed surgery on the Plaintiff consisting of a lumbar laminectomy at the L4-L5 and L5-S1 and bilateral foraminotomies at the L4-L5 and L5-S1 with Baxano at West Chester Hospital ["the first surgery"].

14. Plaintiff continued to receive postoperative treatment with Dr. Durrani, this time through his CAST offices in Blue Ash.

7

15. Plaintiff continued to have appointments with Dr. Durrani up to mid 2012.

16. During a visit with Dr. Bradley Mullen in mid 2014, Plaintiff was informed that his surgery with Dr. Durrani was unnecessary.

17. Plaintiff continued to suffer from constant back and groin pain after the surgery, as bad and sometimes worse then before surgery with Dr. Durrani.

18. Currently, Plaintiff is unemployed as a result of constant doctor visits and cannot walk or ride in cars for long periods of time, bend, or lift objects.

19. UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

20. Francis Barrett was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

21. Joseph Broderick, M.D. was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

22. Margaret Buchanon was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

23. Rev. Damon Lynch, Jr. was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

24. Myles Pensak, M.D. was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

25. Creighton B. Wright, M.D. was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

26. Jeffrey Wyler was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

27. James Kingsbury was a member of the Board of Directors of UC Health during the time Dr. Durrani was credentialed, re-credentialed and privileged at West Chester Hospital/UC Health from 2009 through sometime in 2013.

28. From 2009 through 2013, Dr. Kevin Joseph was and is the President of West Chester.

29. From 2009 through 2013, Dr. Edward Crane was and is the President of the Medical Staff of West Chester.

30. From 2009 through 2013, Jeff Drapalik was and is the CFO of West Chester.

31. From 2009 through 2013, Paula Hawk was and is the Director of Physician Relations, Director of Quality and Medical staff and Medical Staff/Case Manager of West Chester.

32. From 2009 through 2013, James Kingsbury was the President and CEO of UC Health.

33. From 2009 through 2013, Dr. Tim Kremchek was and is the Chairman of Othropaedics Department of West Chester.

34. From 2009 through 2013, Ron Rohlfing was and is the VP Operations/Safety Officer of West Chester.

35. From 2009 through 2013, David Schwallie was and is the Risk Manager of UC Health.

36. From 2009 through 2013, Jill Stegman was and is the Risk Manager of West Chester.

37. In 2009 and 2010, Carol King was the Senior Vice President of Operations of West

Chester.

38. From 2009 through 2013, Dr. Naveed Fazlani was and is the VP of Medical Affairs of West Chester.

39. From 2009 through 2013, Julie Holt was and is the VP Patient Care/CNO of West Chester.

40. At various times from 2009 through 2013, Dr. Elliot Fegelman, Dr. Douglas Feeney and Dr. Haleem Chaundhary were the Chief of Surgery of West Chester.

41. From 2009 through 2013, Dr. M. Hardin was and is the Chief of Medicine of West Chester.

42. From 2009 through 2013, Jerry Magone was and is the President of Medical Staff of West Chester.

43. From 2009 through 2013, Cyndi Trafficant was and is the VP of Patient Care/CNO of West Chester.

44. From 2009 through 2013, Patrick Baker was and is the VP of Patient Care/CNO of West Chester.

45. From 2009 through 2013, Jamie Hunter was and is in charge of Quality Management of West Chester.

46. Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

47. As a direct and proximate result of these surgeries and Dr. Durrani's negligence, Plaintiff has suffered harm.

48. The individual members of the Board of Directors of UC Health under West Chester Medical Executive Committee bylaws made the final determination whether or not to

credential and re-credential Dr. Durrani from 2009 through 2013 and voted to approve his privileges.

49. The individual Board of Directors and Officers can be held liable for corporate torts in their individual capacities if they participated in tortious conduct. The Defendants participated in tortious conduct including but are not limited to negligent credentialing, retention and most significant, fraud and fraud in the concealment.

50. R.C. 1702.55(A) does not apply to these claims because these Defendants **personally** acted in a tortious fashion including fraud and fraud in the concealment.

51. Each individual member of the West Chester Hospital Medical Board who provided final approval of Dr. Durrani's credentialing at West Chester Hospital is individually liable for their intentional shirking of their responsibility to protect the public and patients from Dr. Durrani and for fraud and fraud in the concealment.

52. According to CFO Mike Jeffers, West Chester Hospital was in the business of making as much money as possible regardless of their non-profit status.

53. According to CFO Mike Jeffers, it would be against West Chester Hospital's interest to do something that would limit their earning potential or stop making money.

54. According to CFO Mike Jeffers, Dr. Durrani was the highest monthly revenue generator at West Chester Hospital.

55. The Board of Directors of UC Health, according to CFO Mike Jeffers, were aware of the financial growth of the hospital and of the orthopaedic and spine department and in particular the significant financial revenue generated from Dr. Durrani's surgeries.

56. The Defendants named here personally knew of the issues alleged against Dr. Durrani and chose to ignore them.

11

57. According to CFO, Mike Jeffers, West Chester Hospital tracked the occupancy of their 162 beds by floor.

58. According to CFO, Mike Jeffers, at the end of each month there was a reporting packet that was requested from all the finance directors, and it would be sent to the corporate controller Charity Fannin regarding the monthly finances.

59. According to CFO, Mike Jeffers, the information was tracked by each individual patient in the hospital.

60. According to Annual Reports put together by Jeff Hinds and financial statements of West Chester/UC Health from 2009 through 2013, the Defendants violated R.C. 1702(54), by knowingly placing false information in numerous documents governed by R.C. 1702(54) including over $4 million dollars falsely claimed as income for Medicaid/Medicare fraud and other false statements in their prospectives, reports, financial statements, minutes, records and accounts.

61. West Chester/UC Health made more money from surgical patients than medical patients. Dr. Durrani was a spine surgeon.

62. West Chester/UC Health made more money from more surgical procedures and more diagnostic tests and therapeutic procedures of any kind. Dr. Durrani ordered significant unnecessary diagnostic tests and procedures for his patients and the Defendants knew this fact.

63. Complex cases made West Chester/UC Health more money than simple ones. Dr. Durrani had complex cases.

12

64. There have been serious consequences since orthopedic device companies began sending sales representatives to the operating room of hospitals as they did and do to West Chester/UC Health.

65. The sales representatives assist the back table with the instruments, technique and managed inventory. This has allowed the hospitals to allow their staff to not know specifics about cases and orthopedic systems. This has also allowed the hospitals to avoid the cost of training their staffs for what the sales representatives do. This all applies to West Chester/UC Health

66. The sales representative adds approximately 40% to the cost of the implant and increases implant usage to 30% at West Chester/UC Health.

67. The Dr. Durrani saga at West Chester is Exhibit A of the medical complex run amok for profit and greed over patient care.

68. West Chester/UC Health failed to report a single incident of any kind involving Dr. Durrani to the National Practitioner Data Bank and any other reporting agency including the Ohio Medical Board despite there being countless required reports.

69. According to HRSA Data, 42% of hospitals have never made a single report to NPDB.

70. With respect to Dr. Durrani, West Chester/UC Health did not follow their written medical staff policies and procedures under their professional practice evaluation policy.

71. West Chester/UC Health failed to follow the triggers for peer review from January 2009 through May 2013.

72. From January 2009 through May 2013, with respect to Dr. Durrani, Defendants failed to follow their Medical Staff Code of Conduct which they approved as witnessed by Ed Crane, President of the Medical Staff and Paula Hawk.

13

73. Unknown Defendants include all Members of the Executive Committee, Credentialing Committee and Peer Review from 2009 through 2013.

74. Article I of the MEC bylaws gives the MEC "oversight," of quality of care and patient safety for West Chester.

75. Article 3.1.1 sets forth who the officers are including President, Director of Surgery, Director of Medicine and Chair of Credentials Committee.

76. Article 3.3.1 provides the duties of each department director and Article 4.4 provides the functions of the department.

77. Defendants have refused to produce through discovery the members of West Chester's Medical Executive Committee, Credentialing Committee and Peer Review Committee from 2009 through 2013.

78. The following had direct oversight of Dr. Durrani and direct knowledge of Dr. Durrani issues which should have resulted in his expulsion from West Chester. They also reported directly to Carol King, Senior Vice President of Operations in 2009 and 2010 and/or Dr. Joseph, President 2010 through 2013, and both King and Joseph served on the MEC:

    A. Julie Holt- VP Patient Care/CNO

    B. Ron Rohlfing- VP Operations/Safety Officer

    C. Naveed Fazlani, MD- VP Medical Affairs

    D. Paula Hawk- Director of Physician Relations

    E. Elliott Fegelman, MD- Chief of Surgery

    F. Mike Jeffers- Director of Finance/CFO

    G. Denise Evans- OR Manager (To Julie Holt)

14

H.  Cyndi Trafficant- Perioperative Director (To Julie Holt)

I.  Tom Daskalakis- VP and Chief Operations Officer

J.  Jerry Magone, MD- President of Medical Staff

K.  Patrick Baker- VP/CNO

L.  Jamie Hunter- Quality Management

M.  Kevin Brooks- Pharmacy (BMP-2/PureGen)

N.  Barb Butz- Credentialing (Paula Hawk)

O.  Gina Witko- Accreditation (Paula Hawk)

P.  Jill Stegman- Risk Manager (Paula Hawk)

79. The individual Board Members and above officers are responsible for accreditation, certification, standardized review, peer review, professional review, credentialing and administrative committees.

80. According to Barbara Butz, she prepared the application for credentials to be reviewed by the department directors, the credentialing committee, the MEC and the Board.

81. According to Grant Wenzel, there was a marketing campaign that "spoke of our capabilities" in spine surgery.

82. West Chester/UC Health and the Defendants allowed Dr. Durrani from at least August 1, 2010 to October 5, 2010 to perform surgeries at West Chester while suspended. Over 30 patients had surgeries during this time period. This intentional egregious conduct is appalling and represents fraud in the concealment. None of these 30 plus patients would have allowed Dr. Durrani to perform their surgery had they known Dr. Durrani was suspended.

15

83. West Chester/UC Health and Defendants bragged about and still brag about their spine surgery capabilities.

84. West Chester/UC Health failed to comply with their Medical Staff Bylaws which include:

   a) Bylaws

   b) Credentialing Plan

   c) Rules and Regulations

85. All recommendations on credentialing and privileges are made by the Medical Executive Committee to the Board of Directors.

86. The Board of Directors are the final decision maker on credentialing and privileges and have the right to request more information and vote yes or no on the issue of approval.

87. The Board of Directors had control over all financial budget issues which includes marketing and promoted West Chester's "capabilities" in spine.

88. The officers and CEO of West Chester received bonuses based upon financial performance approved by the Board of Directors. The Board of Directors also set their own salaries. They too benefited from their negligent and fraudulent conduct.

89. The list of negligent acts, intentional acts and fraudulent acts by Dr. Durrani known to the hospital management, administration and board members including these Defendants include:

   1) Dr. Durrani was the #1 money making doctor for West Chester.

   2) West Chester planned to lease Dr. Durrani the fourth floor of the hospital for CAST physical therapy.

   3) According to Paula Hawk, West Chester and Dr. Durrani were "partners in crime."

4) West Chester allowed three days of blocked surgery time and allowed more than one surgery at a time.

5) West Chester ignored their Medical Executive Committee bylaws when it came to credentialing and retaining Dr. Durrani.

6) West Chester/UC Health knew Dr. Durrani was doing extensive multiple surgeries on patients.

7) West Chester/UC Health knew of Dr. Durrani's issues at other issues at hospitals before his application of privileges at West Chester.

8) West Chester/UC Health knew about the "Shanti Shuffle" which is an expression to describe Dr. Shanti, Dr. Durrani's employee spine surgeon, performing spine surgeries for Dr. Durrani without the consent of the patient.

9) West Chester/UC Health knew about "emergency" add on issue where Dr. Durrani would claim a surgery was an emergency to add it on to an existing schedule.

10) West Chester/UC Health knew PureGen was being used improperly by Dr. Durrani including that was never approved for human use and they bought it from Dr. Durrani.

11) West Chester/UC Health knew Dr. Durrani was the biggest revenue generator.

12) West Chester/UC Health knew Dr. Durrani would perform multiple surgeries at the same time in the OR.

13) West Chester/UC Health knew Dr. Durrani was not dictating OR reports or dictating them extremely late, often times up to six months.

14) West Chester/UC Health knew Dr. Durrani's patients had extended anesthesia waiting for surgery.

15) West Chester/UC Health marketed themselves as a world leader in spine surgery.

16) West Chester/UC Health knew Dr. Durrani was "over-utilizing."

17) The officers and administrators in depositions have admitted West Chester/UC Health knew of the issues involving Dr. Durrani.

18) West Chester/UC Health knew Dr. Durrani was not obtaining proper informed consents from his patients.

19) West Chester/UC Health knew Dr. Durrani dictated discharge summaries late and sometimes not at all.

20) West Chester/UC Health knew they were not following their bylaws, rules and policies in their supervision of Dr. Durrani.

21) West Chester/UC Health knew Dr. Durrani was abusive to staff.

22) West Chester/UC Health knew Dr. Durrani was "sloppy" in surgery.

23) West Chester/UC Health knew staff and medical staff would lie regarding Dr. Durrani issues.

24) West Chester/UC Health forced silence upon staff and medical staff.

25) West Chester/UC Health knew Dr. Durrani performed surgeries too late into night to the detriment of patient safety.

26) West Chester/UC Health knew Dr. Durrani's use of improper hardware in spinal surgeries.

27) West Chester/UC Health knew Dr. Durrani sometimes marketed himself as a neurosurgeon to patients.

18

28) West Chester/UC Health knew Dr. Durrani performed procedures beyond his scope of practice and training.

29) West Chester/UC Health knew Dr. Durrani performed surgeries with inadequate training.

30) West Chester/UC Health knew Dr. Durrani used "cut and paste" in his OR reports.

31) West Chester/UC Health knew Dr. Durrani engaged in improper financial relationships with orthopaedic product vendors.

32) West Chester/UC Health knew Dr. Durrani had the lack of attention to detail as required of a spinal surgeon.

33) West Chester/UC Health knew multiple Dr. Durrani patients suffered from improper VATS procedures, resulting in various reactive airway diseases postoperatively.

34) West Chester/UC Health knew they did not do proper credentialing procedures of Dr. Durrani prior to privileging him as a surgeon.

35) West Chester/UC Health knew Elizabeth Garrett (physician's assistant) was present and active in the OR as an assistant surgeon without the proper approval.

36) West Chester/UC Health allowed and promoted Dr. Durrani to give seminars knowing he misrepresented his status at Children's Hospital and University Hospital.

37) West Chester/UC Health knew Dr. Durrani had an improper personal relationship with Elizabeth Garrett.

19

38) West Chester/UC Health knew Dr. Durrani's patients were having anesthesia related complications intraoperatively and postoperatively, and did not disclose it to patients.

39) West Chester/UC Health knew Dr. Durrani failed to disclose to patients and family medical problems encountered during surgery.

40) West Chester/UC Health knew Dr. Durrani was creating health care billing fraud and they too committed billing fraud.

41) West Chester/UC Health knew Dr. Durrani handpicked patients with optimal health insurance for unnecessary surgeries to profit himself and the hospital.

42) West Chester/UC Health knew Dr. Durrani often did not contact his patient's primary care practitioner for in-patient hospital follow up appointments, and instead picked West Chester staff to cover maximize profit, and not have to disclose his wrongdoings.

90. The Annual Reports of UC Health reflect the bragging by the management, administration and board, including Defendants, of West Chester's financial performance and spine awards with full knowledge of the false information contained in them including over $4 million in fraudulent Medicaid and Medicare billings. The one for the Fiscal year ended June 30, 2013 is the last one applicable to Dr. Durrani, his last year at West Chester.

## SPECIFIC MEC BYLAW VIOLATIONS

91. The board, management, staff, employees, the Defendants and agents of West Chester/UC Health failed to follow the West Chester/UC Health Medical Staff Bylaws, Rules, Policies and Regulations including OR rules which are detailed and follow this

paragraph. They intentionally violated these bylaws, rules, policies and regulations by not only not following them, but by ignoring them and their breach of their duty under them caused harm to Plaintiffs including inflicting fraud upon them. There is no more culpability by West Chester/UC Health than their failure to do their duty under their own rules. The letter to a physician accompanying an application for privileges at West Chester states in part: "West Chester Medical Center...a very dedicated, compassionate group of clinical and administrative professionals. Our team is eager to serve the community..." Nothing is further from the truth. It should read: "We want doctors who can make us money regardless what happens to patients."

92. Dr. Durrani in 2008 had to complete an application to join the medical staff at West Chester Hospital. It has not been produced under claim of privilege. In May 2009, the Health Alliance of Greater Cincinnati, Inc. still was involved at West Chester Medical Center. Their name appears on the West Chester Medical Center, Medical Staff Bylaws. The Bylaws have been amended from time to time, but for the most part remain the same from 2009 through 2013. The following apply to the Plaintiffs case.

93. **The Preamble of the West Chester Bylaws** states in part the Medical Staff is the "self-governing body" of the Medical Center. Board as defined in the bylaws "means the governing board of the Medical Center which shall have final responsibility for the affairs of the Medical Staff." Dr. Durrani from January 1, 2009 to May 2013 was a member of the Medical Staff.

94. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** Board means the governing board of the Medical Center (i.e., its Board of Trustees or Directors) which shall have final responsibility for the affairs of the Medical Staff.

95. **West Chester/UC Health bylaws for West Chester Medical Center states in part:**

"Clinical Privileges or Privileges means the rights granted to a Practitioner to provide those diagnostic, therapeutic, medical, surgical, dental or podiatric services specifically delineated to the Practitioner."

The facts reflect the Board of West Chester failed in their responsibility to "govern the affairs of the Medical Staff" as it pertains to Dr. Durrani.

96. **West Chester/UC Health bylaws for West Chester Medical Center states in part:**

"Credentialing Plan means the credentialing plan described in Medical Center's Medical Staff Credentialing Plan, contained in Section II of these Bylaws."

97. **West Chester/UC Health bylaws for West Chester Medical Center states in part:**

"Department Director means the person voted on by a Majority of Active Staff Members of the Department, recommended by the Medical Executive Committee, and approved by the Board."

98. **West Chester/UC Health bylaws for West Chester Medical Center states in part:**

"Senior Vice President means the individual bearing that title, or a like title, who is appointed to act on the Medical Center's behalf in the overall administrative management of the Medical Center."

99. **West Chester/UC Health bylaws for West Chester Medical Center states in part:**

"Medical Executive Committee means the group of Medical Staff Members and Ex officio representatives chosen to represent and coordinate the overall activities and policies of the Medical Staff and its subdivisions." The Medical Executive Committee were responsible for insuring they followed the rules, the administrators and employees followed the rules and Dr. Durrani followed the rules.

22

100.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff or staff means the formal organization created by the Board, composed of Practitioners who have been appointed by the Board to assist the Medical Center in carrying out certain assigned functions."

101.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff Bylaws or Bylaws shall mean the bylaws of the West Chester Medical Center medical Staff, including but not limited Section I: Medical Staff Bylaws, Section II: Medical Staff Credentialing Plan, Section III: Fair Hearing Plan, and Section IV: Rules and Regulations."

102.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Medical Staff Policies shall mean the policies and procedures adopted by the Medical Staff, and approved by the Medical Executive Committee and the Board, from time to time. These shall include these Medical Staff Bylaws, the Credentialing Plan, the Fair Hearing Plan, the Rules and Regulations and any other policy deemed necessary and appropriate to carry out the duties and responsibilities of the medical staff delegated by the Board."

103.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Representative means the Board and any director, trustee or committee thereof; the Senior Vice President, or the Senior Vice President's designee; any employees of other organizations; a Medical Staff organization or any committee of the Medical Staff or the Board, and any individual authorized by any of the foregoing performing specific information gathering, analysis, use or disseminating functions, which relate to any Professional Review Activity (as that term is defined under HCQIA)."

104.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 1.3 of Medical Staff Bylaws Purposes:  The purposes of the Medical Staff are, without limitation to provide oversight over the quality of care, treatment and services delivered by Practitioners who are credentialed and privileged through the Medical Staff credentialing process."

Medical Staff negligently and intentionally did not provide this oversight over Dr. Durrani.

105.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:**  Section 1.4 of Medical Staff Bylaws Responsibilities:  It is the obligation and responsibility of the Medical Staff to improve the quality of care, treatment and services and patient safely through participation in the Medical Center performance improvement program by assisting in the evaluation of Practitioner's credentials for initial and continuing medical staff appointment and for the delineation of clinical privileges in a manner that is thorough, evidence-based, effective and timely.

Medical Staff negligently and intentionally did not properly evaluate Dr. Durrani as required under Section 1.4 and this proximately caused harm to Plaintiffs.

106.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 3.1 GENERAL OFFICERS OF THE MEDICAL STAFF:  The Medical Staff Officers shall be A) President of the Medical Staff; B) President Elect of the Medical Staff; C) Department Director of Surgery; D) Department of Director of Medicine; E) Chair of the Credentials Committee."

107.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 3.2 DUTIES OF MEDICAL STAFF OFFICERS President of the

24

Medical Staff: The President of the Medical Staff serves as the Chief Medical Officer of the Medical Center. As the principal elected official of the Medical Staff shall: A) Aid in coordinating the activities and concerns of the Medical Center Administration and of the nursing and other patient care services with those of the Medical Staff; Communicate and represent the opinions, policies, concerns, needs and grievances of the Medical Staff to the Board, the Senior Vice President and other officials of the Medical Staff; C) Be responsible for the enforcement of the Medical Staff Bylaws, Rules and Regulations, and other Medical Staff policies, and for implementation of sanctions and corrective action where indicated, and for Medical Staff compliance with procedural safeguards in all instances where corrective action has been requested against a Practitioner; D) Call, preside at, and be responsible for the agenda of all general Medical Staff meetings; E) Serve as Chairperson of the Medical Executive Committee and may serve as an Ex Officio member of all the Medical Staff committees."

The Presidents of the Medical Staff, Carol King and Kevin Joseph, MD negligently and intentionally from January 2009 through 2013 failed in these responsibilities as they pertained to Dr. Durrani and this proximately caused harm to Plaintiffs.

108.   **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "The Department Director of Surgery may organize or operate specialty sections to assist in carrying out the purposes of the Department advancing education or improving patient care. Each Department Director may, with Medical Executive Committee approval, establish such sections within his or her department and designate the

membership of each as he or she deems appropriate. The Department Director of

Surgery shall be an ad-hoc member of any committee within any other Defendant.

109.     **West Chester/UC Health bylaws for West Chester Medical Center states in**

**part:** The Department Director of Medicine may organize or operate specialty sections

to assist in carrying out the purposes of the Department advancing education or

improving patient care. Each Department Director may, with Medical Executive

Committee approval, establish such sections within his or her department and designate

the membership of each as he or she deems appropriate. The Department Director of

Medicine shall be an ad-hoc member of any committee within any other Defendant."

110.     **West Chester/UC Health bylaws for West Chester Medical Center states in**

**part:** "The Credentials Chair will assist in organizing a credentials committee for the

Medical Center in which there are at least three physician representatives each from the

disciplines of both medicine and surgery and at least one physician representative from

the discipline of emergency medicine."

111.     **West Chester/UC Health bylaws for West Chester Medical Center states in**

**part:** "Section 3.3 OTHER OFFICIALS OF THE MEDICAL STAFF- Each Department

Director shall be a board certified appointee of the Active Staff, and shall be willing and

able to discharge the functions of the office. Should a Department Director be recruited

or nominated who is not a Member of the Active Medical Staff, the initial appointment of

such Member as a Department Director shall be designated as "acting" until such time as

Active Staff status is achieved."

Dr. Tim Kremchek, Orthopedic Chair and other chairs abdicated their

responsibility.

112.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Each Department Director shall:  A) Be accountable to the Medical Executive Committee and to the President of the Medical Staff for all professional, administrative and clinical activities within his or her Department and particularly for the quality of patient care rendered by appointees of the Department and for the effective conduct of the patient care evaluation and monitoring functions delegated to his or her Department; B) Coordinate and ensure Department staff members participate in the continuous assessment and improvement of the quality of care and services provided and maintenance of quality control programs as appropriate; C) Submit reports to the Medical Executive Committee as required concerning: 1) findings of Department review, evaluation and monitoring activities, actions taken thereon, and the results of such action; 2) recommendations for maintaining and improving the quality of care provided in the Department; 3) recommending criteria for clinical privileges relevant to the care provided within the Department; 4) recommendations for the number of qualified and competent Practitioners that the Department Director deems appropriate to provide patients with appropriate levels of care and services; 5) such other matters as may be required by the Medical Executive Committee."

113.     The Director of Surgery, Director of Medicine, the Credentials Chair and each Department director negligently and intentionally failed in their responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.  The Department heads and the President of staff intentionally and negligently failed to monitor Dr. Durrani, review his credentials and assess his utilization and these failures proximately caused harm to Plaintiffs.  These bylaw provisions consistently reference quality of care.  Dr.

27

Durrani was a complete failure in quality of care and the "blood" is on the hands of those who under these Bylaws decided West Chester "needed the money."

114.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Develop and implement Departmental programs in cooperation with the President of the Medical Staff and consistent with the provisions of Article IV, for evaluation of patient care, ongoing monitoring of practice, credentials review and privilege delineation, medical education and utilization review, including orientation and continuing education of all persons in the Department and maintenance of quality programs as appropriate."

115.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Provide for the continuing monitoring of professional performance of all individuals in the Department who have delineated clinical privileges."

116.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Maintain continuing review of the professional competence, qualifications, and performance of all Practitioners with clinical privileges and of all Allied Health Professionals with specific services in the Department who provide patient care and report regularly thereon to the President of the Medical Staff and to the Medical Executive Committee."

The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

117.     **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Transmit to the appropriate authorities as required by these Bylaws, his or her recommendations concerning appointment and classification, reappointment, delineation

28

of clinical privileges or specific services, and corrective actions with respect to Practitioners in the Department."

The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

118. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Enforce the Medical Center and Medical Staff Bylaws, Rules and Regulations and policies and procedures of both the Medical Staff and the Department within the Department including initiating corrective action and investigation of clinical performance and ordering consultations to be provided or to be sought when necessary."

The Department Directors negligently and intentionally failed in these responsibilities as to Dr. Durrani including not properly investigating and/or ignoring the need for such and taking no corrective action all of which proximately caused harm to Plaintiffs.

119. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Section 4.4 FUNCTIONS OF DEPARTMENTS: The primary responsibility delegated to each Department is to implement and conduct specific review and evaluation activities that contribute to the preservation and improvement of the quality and efficiency of patient care provided in that Department. To carry out this responsibility, each Department shall: A) Conduct special studies of care and specific monitoring activities, including mortality and surgical case review, for the purpose of evaluating clinical work performed under its jurisdiction; B) Recommend guidelines to the appropriate committee for the granting of clinical privileges and the performance of specified services within the Department; C) Conduct or participate in, and make

29

recommendations regarding the need for continuing education programs and to findings
of review, evaluation and monitoring activities; D) Monitor on a continuing and
concurrent basis, adherence to: 1) all applicable Medical Staff and Medical Center
policies and procedures 2) requirements for alternate coverage and for consultations; 3)
sound principles of clinical practice; E) Coordinate the patient care provided by the
Department's appointees with nursing and ancillary patient care services and with
administrative support services."

The Department Directors negligently and intentionally failed in these
responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

120. **West Chester/UC Health bylaws for West Chester Medical Center states in**
**part:** "Section 5.2 MEDICAL EXECUTIVE COMMITTEE Composition: All Members
of the Active Medical Staff are eligible for appointment or election to the Medical
Executive Committee. The Medical Executive Committee shall consist of the President
of the medical Staff, President-Elect of the medical Staff, immediate Past President of the
Medical Chair of the Credentials Committee, Vice President of Medical Affairs,
Department Director of Emergency Medicine, Medical Director of Radiology Section,
Medical Director of Anesthesia Section, and Four physician members at large who shall
be appointed by the President of the Medical Staff. The Senior Vice President, the
Chairperson of the Performance Improvement Committee (if that position is held by an
individual other than the Past President of the Medical Staff), and such other members of
Medical Center administration as are appropriate to the subject matter may be appointed
as Ex Officio members of the Medical Staff Shall serve as Chairperson of the Medical
Executive Committee."

121.　　**West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Duties: The duties of the Medical Executive Committee shall be to: A) Receive or act upon reports and recommendations from the Departments, Committees, and Officers of the Medical Staff concerning patient care quality and appropriateness of reviews, evaluations, and monitoring functions, and the discharge of their delegated administrative responsibilities and to recommend to the Board specific programs and systems to implement these functions; B) Oversee all activities relating to self-governance of the Medical Staff; C) Oversee performance improvement initiatives relating to professional services provided by all Practitioners and any Allied Health Professional privileged through the Medical Staff Services Office; D) Oversee the provision of care, treatment and services to ensure that patients with comparable needs receive a comparable standard of care; E) Review, act on, where appropriate, and coordinate the activities of and policies adopted by the Medical Staff, Departments, and committees; F) Relay (with or without comment) recommendations to the Board all matter relating to appointments, reappointments, Medical Staff category, Department assignments, Clinical Privileges, corrective action, termination of Staff membership and the mechanisms for fair hearing procedures: G) Account to the Board and to the Medical Staff for the overall quality and efficiency of patient care in the Medical Center and for the medical Staff's participation in performance improvement activities including physician peer review; H) Take reasonable steps to insure professionally ethical conduct and competent clinical performance on the part of the Medical Staff appointees including conducting evaluations appropriate to assess the clinical privilege requested, initiating investigations and initiating and pursuing corrective action, when warranted; I) Make

31

recommendations to the Board and administration on a variety of issues including those relating to the structure of the Medical Staff, Medical Staff membership, Medical Staff credentialing and privileging processes, delineations of privilege for each Practitioner, reports of other Medical Staff committees, and policies for organ and tissue procurement and donation; J) Inform the Medical Staff of the accreditation program and the accreditation status of the Medical Center; K) Participate in identifying community health needs and in setting Medical Center goals and implementing programs to meet those needs; L) formulate and/or approve processes to review all requests for Clinical Privileges, medical Staff Rules and Regulations and policies and procedures; and M) Act for the Medical Staff at intervals between Medical Staff meetings, subject to any limitation imposed by the Bylaws or other medical Staff policies and procedures."

The Department Director negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

122.     **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Section 5.3 CREDENTIALS COMMITTEE:** Composition: The Credentials Committee shall be composed of the President-Elect of the Medical Staff, and not less than seven (7) additional voting Members, including at least three Surgical and three medical staff members, and one medical staff member from the Emergency Department, who are appointed by the President of the Medical Staff and subject to the approval of the Board. Voting Members of the Credentials Committee shall be Members of the Active, Courtesy or Affiliate Medical Staff, and are selected from a variety of Departments and specialties. Other non-physician Members and/or representatives of Medical Center

administration may serve, as appropriate, as Ex Officio Member of the Credentials Committee."

123. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Duties: The primary duties of the Credentials Committee shall be to A. investigate the credentials of all initial applicants for appointment and reappointment to either the Medical Staff or the AHP staff; and B. Make recommendations to the Board concerning applications for initial appointment, granting of Clinical Privileges, applications for reappointment, changes in Clinical Privileges, and changes in Staff category."

The members of the Credentialing Committee failed in their responsibilities as to Dr. Durrani and those failures proximately caused harm to Plaintiffs.

124. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Section 7.1 ARTICLE VII - PROCEDURAL RIGHTS: ADVERSE ACTION/RIGHT TO HEARING** By The Medical Executive Committee or the Board: When a Practitioner receives a recommendation of corrective action that may adversely impact Clinical Privileges, the Practitioner is entitled to request a hearing under and subject to the terms of the Fair Hearing Plan of the Medical Center. **Summary Suspension:** When a Practitioner receives notice that his or her Clinical Privileges have been summarily suspended pursuant to the Credentials Policy and Procedure manual, the Practitioner shall be entitled to request a hearing under and subject to the terms of the Fair Hearing Plan of the Medical Center."

The Medical Executive Committee negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

33

125. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ADVERSE ACTIONS:** Events triggering a right to a hearing are set forth in the Fair Hearing Plan (Section III of these Bylaws) and shall include: A. denial if initial staff appointment (except as set forth in the Fair Hearing Plan); B. Denial of reappointment (except as set forth in the Fair Hearing Plan); C. suspension of staff appointment; D. revocation of staff appointments; E. suspension of admitting privileges; F. denial or restriction of requested Clinical Privileges; G. reduction in Clinical Privileges; H. imposition of a joint admission requirement; I. suspension of Clinical Privileges; or J. revocation of Clinical Privileges."

The Medical Executive Committee negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

126. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE VIII CONFIDENTIALITY, IMMUNITY AND RELEASES AUTHORIZATIONS AND CONDITIONS:** By submitting an application for Medical Staff appointment or reappointment, or by applying for or exercising Clinical Privileges or providing specified patient care services at this medical Center, a practitioner: A. Authorizes Representatives of the Medical Center and the Medical Staff to solicit, provide and act upon information bearing on his or her professional ability and qualifications; B. Agrees to be bound by the provisions of this Article and to waive all legal and equitable claims against any Representative who acts in accordance with the provisions of this Article; and C. further agrees that he will not seek legal or equitable redress until such time as all administrative remedies provided for in any Medical Staff Policy has been exhausted."

Despite having immunity to act, which is to encourage them to act, West Chester UC Health negligently and intentionally did not act and these failures proximately caused harm to Plaintiffs.

127. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Section 8.3 IMMUNITY AND LIABILITY: No Liability for Action Taken:** No Representative of the Medical Center or Medical Staff shall be liable to a Practitioner for damages or other relief for any decision, action, statement or recommendation made within the scope of any appointment, reappointment, credentialing or peer review consideration or decision."

Despite having immunity to act, which is to encourage them to act, West Chester UC Health negligently and intentionally did not act and these failures proximately caused harm to Plaintiffs.

128. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE 3 APPLICATION PROCESS:** Revocation of Privileges: Information as to whether Applicant's staff appointment and/or clinical privileges have ever been terminated (whether voluntarily or involuntarily), denied, revoked, suspended, reduced or not renewed at the Medical Center or at any other healthcare entity, and whether any proceeding is pending or has been instituted which, if decided adversely to Applicant, would result in any of the foregoing."

Defendants negligently and intentionally ignored the information they knew as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

129. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "Withdrawal of Application:** Information as to whether Applicant has ever

35

withdrawn his or her application for appointment, reappointment, or clinical privileges, or resigned from a medical staff before final decision by a healthcare entity's Board."

130. **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Professional Sanctions: Information as to whether any of the following have ever been suspended, revoked or denied, restricted or terminated (whether voluntary or involuntary) and whether any proceeding is pending or has been instituted which, if decided adversely to Applicant, would result in any of the following being suspended, revoked or denied restricted or terminate: (1) licensure or registration with any local, state or federal agency or body to practice his or her profession; (2) appointment or fellowship in a local, state or national professional organization; (3) any specialty board certification; or (4) Applicant's narcotics registration certificate."

Defendants negligently and intentionally ignored the information as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

131. **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE I CORRECTIVE ACTION- PART B: INDICATORS OF NEED FOR CORRECTIVE ACTION** Corrective action may be indicated whenever a Physician Practitioner exhibits acts, demeanor, or conduct reasonably likely to be (1) detrimental to patient safety or to the delivery of quality patient care within the Medical Center; (2) contrary to the ethics of the profession; (3) contrary to the Medical Staff Bylaws and rules or regulations, Code of Conduct, or the policies and procedures of Medical Center; (4) below applicable professional standards; or (5) disruptive to Medical Center operations or detrimental to the best interests of the Medical Center. In light of the Medical Center's and its Medical Staff's obligations to patients, staff, the community

36

and the medical profession, this requirement to provide information shall be interpreted in favor of prompt, full and frank disclosure."

Defendants intentionally and negligently failed in these responsibilities as to Dr. Durrani including ignoring Dr. Durrani's demeanor and conduct detrimental to patient safety and quality of patient care; Dr. Durrani's violation of ethics, bylaws, policies and rules, all disrupting the Medical Center and this proximately harm to Plaintiffs.

132.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "The Department Director, or President of the Medical Staff, as the case may be, is expected to exercise reasonable discretion in discreetly and promptly determining whether additional inquiry and/or intervention are necessary.  It is the purpose of this policy only to address clinical performance and/or professional conduct issues that potentially place patients at risk or are disruptive to the operations of the Medical Center."

The Department Director and President of Medical Staff negligently and intentionally failed in these responsibilities as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

133.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "A practitioner who fails to promptly report disciplinary or other action taken regarding clinical performance or professional conduct in accordance with this policy shall be deemed to have failed to fulfill the ongoing conditions of appointment and/or reappointment and may be subject to corrective action in accordance with medical Center and Medical Staff Bylaws, regulation and policies."

Countless practitioners intentionally and negligently ignored reports regarding Dr. Durrani and these failures proximately caused harm to Plaintiffs.

134.     **West Chester/UC Health bylaws for West Chester Medical Center states in part: "PATIENT RIGHTS/RIGHT TO REFUSE TREATMENT INFORMED CONSENT** All physicians will comply with medical Center's informed consent policies. Any procedure that requires informed consent shall be, absent an emergency, performed only after receiving a properly signed informed consent form, which contains evidence that the risks, benefits, alternative treatments and risks associated with alternative treatments have been discussed with and are understood by the patient. Where the patient is a minor, or an adult who lacks legal capacity to offer his or her informed consent as result of incompetence or incapacity, the physician may secure informed consent from a person having legal authority to offer such consent on behalf of the patient. The Attending Physician is responsible to ensure that the signed informed consent form and all documentation of the informed consent conversation is properly reflected in the patient's medical record. Procedures that are performed on an emergency basis can be performed without securing informed consent, if, in the opinion of the Attending Physician serious harm to the patient would result from delaying the procedure. All decisions to perform procedures on an emergency basis without the informed consent of the patient shall be documented in the patient's medical record. Additionally, every adult patient having requisite mental capacity shall have the right to permit or refuse treatment."

Dr. Durrani, CAST and West Chester/UC Health and Defendants intentionally and negligently ignored this requirement as to Plaintiffs and these failures proximately caused harm to Plaintiffs.

135.    **West Chester/UC Health bylaws for West Chester Medical Center states in part: "ARTICLE 5 MEDICAL RECORDS CONTENTS** – The medical record of each patient shall contain at least sufficient information to identify the patient (or a notation of the reason why such information is not available); emergency care provided to the patient before arrival at the Medical Center, and, where appropriate, the times and means of arrival at the Medical Center; symptom/complaint and medical history; a complete history and physical examination with proper authentication; conclusions and impressions draw from the history and physical and an admission diagnosis; a tumor staging form for patients receiving treatment for cancer; any known allergies to food and medication; diagnostic and therapeutic orders; evidence of appropriate informed consent; treatment goals and plan, which is individualized and appropriate to the needs and health status of the patient; evidence of regular review and revisions to the treatment plan; diagnoses and conditions identified during the course of care; all diagnostic and therapeutic order and medications ordered or prescribed; all diagnostic procedures, tests and results; patient response to care, treatment and services; documentation and findings relating to the initial assessment and subsequent reassessments; clinical and consultative observations including results; documentation of complications, Medical Center acquired infections and unfavorable reactions to drugs and anesthesia; acknowledgement of medical Center's advice regarding advance directives and evidence of the advance directives of the patient; procedure and operative reports; discharge diagnoses, a

39

completed and properly authenticated discharge summary; instructions for follow-up care and records of all communication with the patient relating to care, treatment and services; medications prescribed on discharge; the patient's language and communication needs; any electronic patient-generated information; conclusions at the termination of hospitalization or treatment; and any other item deemed necessary by the Attending Physician. All entries in the medical record must be accurate, timely, and legible and should be timed and must be dated and signed. This is to include Physician signatures on verbal orders as well as all other entries in the medical record."

136.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "HISTORY AND PHYSICAL EXAMINATION- Admission History and Physical – A complete history and physical examination (H&P) shall be performed and recorded for each inpatient within twenty-four (24) hours of admission and shall be authenticated by a qualified Physician Practitioner. All entries should be timed and must be dated and signed. The admission H&P must include these elements:"

a.    Chief Complaint

b.    Details of Present Illness

c.    Relevant past, social & family histories

d.    Inventory of body systems

e.    Complete physical examination

f.    Conclusion/Impression drawn from the examination

g.    Course of action/Treatment plan

h.    Medical Reconciliation Sheet

i.    This never happened for Plaintiffs.

137.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Invasive Procedure History and Physical – For individuals undergoing an invasive or operative procedure requiring general anesthesia, deep sedation, or moderate sedation, the medical record must document a current, thorough physical examination prior to the performance of the procedure.  The invasive or operative H&P must include these elements:"

    a.      Chief Complaint

    b.      Details of Present Illness

    c.      Relevant past, social & family histories

    d.      Inventory of body systems

    e.      Complete physical examination

    f.      Conclusion/Impression drawn from the examination

    g.      Course of action/Treatment plan

    h.      Medical Reconciliation Sheet

    i.      This never happened for Plaintiffs.

138.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "For patients undergoing procedures on an outpatient basis, assessment and documentation of the patient's H&P must be complete within 30 days prior to the procedure.  However, in this circumstance, the patient must be re-evaluated the day of the procedure to assess whether or not there has been any substantive change in the patient's condition.  Either concurrence with previous findings or changes from previous findings must be documented in the medical record.  If the procedure results in the patient being

41

subsequently admitted to the Medical Center, the H&P will, within 24 hours of admission, be expanded to include all elements required for an admission H&P." This never happened for Plaintiffs.

139.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Operative reports - A brief operative progress note must be entered in the medical record immediately after invasive and operative procedures.  A diagnosis or provisional diagnosis shall be noted in the medical record prior to any procedure."

140.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Operative reports must be dictated or written in the medical record immediately after they are performed and contain a name and a description of the procedure, estimated blood loss, a description of the findings, the technical procedures used, the specimens removed, and the postoperative diagnosis.  In every event, the operative report will be completed before the patient is transferred to the next level of care."

141.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Post-operative observation notes recording the patient's vital signs, level of consciousness, medications, blood and blood components administered, and notes of any unusual events or complications shall be made appropriate."

142.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "Conclusions at the termination of hospitalization (discharge summary) - A discharge summary shall be written or dictated on all medical records of patients hospitalized over forty-eight (48) hours."

143.    **West Chester/UC Health bylaws for West Chester Medical Center states in part:** "A final progress note may substitute for the discharge summary in all patients

42

policies applicable to physicians. This shall include, but not be limited to, policies regarding harassment and disruptive conduct of medical staff members."

Dr. Durrani, CAST and Defendants ignored these requirements as to Dr. Durrani and these failures proximately caused harm to Plaintiffs.

159.    West Chester/UC Health employees and agents working at West Chester Medical Center made complaints to Defendants regarding Dr. Durrani's negligence, inappropriate conduct, policy violations, bylaw violations, rule violations and criminal acts from January 2009 through 2013. From January 1, 2009 through 2013, Defendants were obligated under state and federal law to insure Dr. Durrani performed surgeries in compliance with the standard of care for each surgery on each patient, including Plaintiffs. Defendants failed to protect Plaintiffs from harm from Dr. Durrani as was their legal duty to do so.

160.    Because the boards and management of West Chester/UC Health from January 1, 2009 through 2013 included surgeons at West Chester/UC Health and other physicians and healthcare professionals working at West Chester/UC Health, the entire board and management had knowledge of Dr. Durrani's performing unnecessary spine surgeries, his numerous deviations in standard of care, violations of state and federal law and breach of West Chester/UC Health policies, bylaws, rules and regulations, all of which resulted in harm to Plaintiffs. All the references to Dr. Durrani's conduct described herein pertaining to West Chester/UC Health involves his conduct while on the premises at West Chester/UC Health at West Chester Medical Center. West Chester/UC Health, their boards and their management, knew that Dr. Durrani performed too many spine surgeries

per day and too many at a time including at times four to six a day and two to three at a time.

**MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND**

**DEPOSITION TESTIMONY**

161.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

162.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

163.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

164.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

165.     Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

166.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

167.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

168.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

169.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

170.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

171.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

172.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

173.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries.  They did nothing.

174.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

175.     Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

176.     Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

177.     Dr. Durrani would schedule two to three spine surgeries a day at Children's.

178.     Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

51

179.    Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

180.    Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

181.    There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

182.    Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

183.    Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

184.    Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

185.    Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

186.    Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

187.    Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

52

188.    While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

189.    Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

190.    Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

191.    Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

192.    On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

193.    Defendants committed fraud by misrepresenting Dr. Durrani's reputation. Defendant knew he was doing unnecessary spine surgeries and concealing them from Plaintiffs. With the intent to mislead Plaintiffs, and knowing Plaintiffs would rely upon the misrepresentations and concealment, Defendant caused harm to Plaintiffs. Defendant knew their false information regarding Dr. Durrani was material to Plaintiffs decision making in choosing Dr. Durrani as a surgeon, allowing him to perform surgery, following his recommendation and being trusting to have their procedures at Defendant hospitals.

194.    Dr. Durrani's CAST website states in part: "The entire focus at CAST is on the patient. From the ease in getting in to see a physician…to wellness, therapy and treatment programs that can help patients avoid surgery…to minimally invasive techniques if surgery is necessary…to our remarkable facility and one-site convenience.

It's time patients have the level of preventive care and advanced treatment we offer.  Atiq Durrani, MD- Founder of CAST."  As shown and will be shown, this is a material misrepresentation which is false relied upon by Dr. Durrani's patients including Plaintiffs to allow Dr. Durrani to perform unnecessary surgeries on Plaintiffs.

195.    Gerry Goodman worked under a Corporate Integrity Agreement in 2010 at West Chester/UC Health.

196.    Gerry Goodman, from August to November 2010, while serving as the interim director of OR nursing at West Chester Medical Center, complained to administration including Mitch McCrate about Dr. Durrani's deviations and violations of law, policies, bylaws, rules and regulations which were effecting patient care, including Plaintiffs.

197.    Mitch McCrate told Gerry Goodman West Chester/UC Health wasn't concerned because "the hospital had state funding and therefore was not held to qui tam rules."

198.    Gerry Goodman told Mitch McCrate, General Counsel; Jack Talbot, HR; George Caralis, COO and Kevin Joseph, MD, President; that Dr. Durrani had a "partner" who had not received provider status and Dr. Durrani was billing his "partner" under Dr. Durrani's provider number, something which was illegal.

199.    The "partner" was Dr. Shanti.

200.    Dr. Durrani and Dr. Shanti would do three or four cases simultaneously and bill them simultaneously.

201.    Gerry Goodman told McCrate, Talbot, Caralis and Joseph she could not work in a place which condones illegal practices.  They asked her to ignore them.  She refused.

202.    Dr. Durrani, according to Gerry Goodman, did whatever he wanted in the OR and knew he could get away with it including being treated like a king by the vendors.

203.    Vendors such as Medtronic representatives were allowed in the OR after going through the preapproved process they must go through. David Rattigan, Dr. Durrani's primary vendor, worked at Bahler peddling Medtronic products.

204.    Dr. Durrani was abusive to his and West Chester/UC Health staff. This was tolerated by West Chester/UC Health and effected patient care including that of Plaintiffs.

205.    Dr. Durrani never cared about others schedules or the West Chester/UC Health OR schedule.

206.    Dr. Durrani declared every surgery an emergency to ignore schedules.

207.    Dr. Durrani received two full days and two half days of block time at West Chester/UC Health. It was never enough time for his over utilization.

208.    When Gerry Goodman would say no to a Dr. Durrani scheduling request, Dr. Durrani would contact West Chester/UC Health administration and she would be overridden.

209.    Gerry Goodman had skill, knowledge and experience to recognize a "Dr. Durrani" because she had been involved in the outing of another over-utilizer and unnecessary procedure surgeon performing cardiac catherizations.

210.    Spine surgeons usually do one or two a day, possibly three surgeries a day if an emergency.

211.    Dr. Durrani would often do four, five and even six surgeries.

212.    Dr. Durrani and Dr. Shanti would walk from surgical room to surgical room with all the spine patients "open" for an extended time past the standards of care.

55

213.    On at least two occasions, Dr. Durrani patients were open for in excess of an hour waiting for him to come into the case.

214.    When Gerry Goodman would complain to Dr. Durrani about patients being under anesthesia and the operative site open for long periods of time, Dr. Durrani would claim "we are covering anesthesia with antibiotics."

215.    When Dr. Durrani performed with Dr. Shanti these multiple simultaneous procedures, they were billed as if he was the attending surgeon in all three surgeries.

216.    The Dr. Shanti and Dr. Durrani "open and switch" to do the surgery, we have labeled the "Shanti Shuffle."

217.    The Shanti Shuffle is not the normal. Shanti did not assist, he replaced.

218.    Gerry Goodman complained to risk management repeatedly to no avail of the Shanti Shuffle.

219.    When Gerry Goodman pointed out to risk management, Jill Stegman and David Schwallie that Dr. Durrani had all the "red flags" from over utilization and being bounced out of other area hospitals, they responded "how did you know." Gerry Goodman knew because anyone in hospital administration and management in the tristate in 2008 to 2013 knew. Dr. Durrani was no secret.

220.    Jill Stegman and David Schwallie admitted to Gerry Goodman they knew about Dr. Durrani's over utilization, being "bounced out" of other hospitals and all the issues going on with him with the OR, but West Chester needed Dr. Durrani's numbers.

221.    When Gerry Goodman complained to George Caralis about Dr. Durrani, he told Gerry Goodman to "keep your mouth shut and go back to work because you are just an interim."

56

222.    George Caralis told Gerry Goodman that West Chester/UC Health needed Dr. Durrani surgeries and admissions and therefore they were not going to stop him.

223.    Jill Stegman and David Schwallie informed Gerry Goodman they would get back with her about Dr. Durrani in a few days. They never did.

224.    After Gerry Goodman was blown off by David Schwallie and Jill Stegman, she decided

225.    Upon hearing her repeated complaints about Dr. Durrani, George Caralis told Gerry Goodman she was just an "emotional female."

226.    Gerry Goodman reported to no avail patient safety issues caused by the OR staff working from 7 AM to midnight on Dr. Durrani patients. Fatigue caused deviations in standard of care by West Chester/UC Health staff's including in Plaintiffs.

227.    Gerry Goodman knew anesthesia charged per the minute or in fifteen minute increments and she considered it a fraud to bill for unnecessary anesthesia when patients were "open" longer than necessary.

228.    Dr. Durrani would contact Medtronics and other vendors directly, they would bring into the OR what Dr. Durrani requested and then invoice West Chester/UC Health.

229.    During surgeries, Medtronics and other vendors would want to up sell products.

230.    This process was distracting to the OR staff and affected patient care.

231.    Dr. Durrani told Gerry Goodman Dr. Shanti had privileges, but wasn't yet on all the insurance panels.

232.    Gerry Goodman asked Dr. Durrani: "Which panel so he's not doing those cases?"

233.    Dr. Durrani told Gerry Goodman in response: "We're doing these procedures together. They're billed under my name."

234. Gerry Goodman witnessed one case where Dr. Durrani was never in the room at all, just Dr. Shanti. Yet, Dr. Durrani claimed the procedure.

235. Gerry Goodman confronted Dr. Shanti and he simply stated: "Dr. Durrani and I are co-surgeons."

236. Gerry Goodman verified Dr. Shanti was not on the written informed consents for these procedures.

237. Kevin Joseph, MD, and President of West Chester Medical Center, knew everything Gerry Goodman complained about because either she told him or George Caralis told him. Caralis told her he told him.

238. Dr. Durrani had no supervision at all at West Chester/UC Health.

239. When Gerry Goodman attempted to supervise him, the West Chester/UC Health management as described here rebuked her.

240. Gerry Goodman also informed Mitch McCrate, Jill Stegman, David Schwallie, George Caralis and Kevin Joseph, MD, that Dr. Durrani's high volume of fusions of the spine was not usual practice. They ignored these concerns.

241. West Chester/UC Health's board and management, did not provide proper supervision of Dr. Durrani as required through the surgery and orthopedic departments. (See Bylaws section to follow)

242. Gerry Goodman also spoke to the Chief of Surgery at West Chester Medical Center about Dr. Durrani to no avail.

243. Dr. Durrani would also sign operative reports he never dictated with the full knowledge of West Chester/UC Health's board and management. This is yet another practice Gerry Goodman complained about.

244.     Dr. Shanti dictated operative reports he never signed with the full knowledge of West Chester/UC Health's board and management. They knew because Gerry Goodman complained.

245.     Orthopedics and spine surgeries are some of the highest sources of income for a hospital and were too for West Chester/UC Health.

246.     In the spring of 2013, Dr. Peter Stern told Dr. Angelo Colosimo, UC Orthopedic Surgeon that West Chester/UC Health "knew all about Dr. Durrani's issues before he came to us and after he came to us, but we needed the money."

247.     The billings for Dr. Durrani surgeries were sent to Plaintiffs at their homes with requests for payment.

248.     Plaintiffs were required to make payments of uncovered medical bills to Dr. Durrani and CAST.

249.     Dr. Durrani produced, distributed and utilized a video of a lecture involving his EDS patients to solicit more patients.

250.     Unbeknownst to his EDS patients, Dr. Durrani was doing experiments on these EDS patients including many of the Plaintiffs without informing them they were part of an experiment. This too violated West Chester Medical Staff Bylaws as revealed in a later section.

251.     Dr. Durrani claims in his EDS video a 95% success rate with the C1-C2 operations and only one of the twenty-five claimed they would not have the surgery again.

252.     The undersigned counsel represents 20 of these 25 persons and not one would have the surgery again. They are Plaintiffs.

253.     Dr. Tayeb was an employee of Dr. Durrani from 2009 to 2013. Counsel has interviewed him extensively.

254.     Dr. Tayeb will testify that Dr. Durrani improperly selected patients for surgery, and then recommended surgery, including patients with EDS that were not proper candidates for surgery including many of the Plaintiffs.

255.     Dr. Tayeb will testify that improper business practices occurred at CAST, including Dr. Durrani recommending surgeries that were medically unnecessary including the Plaintiffs.

256.     Dr. Tayeb will testify that Dr. Durrani made decisions to place wealth and status over the well-being of his patients including Plaintiffs.

257.     Dr. Tayeb would engage Dr. Durrani in shouting matches at CAST over patient care that others witnessed.

258.     According to Dr. Tayeb, Dr. Durrani would not always speak truthfully about patients having already gone through conservative care.

259.     According to Dr. Tayeb, Dr. Tayeb believes West Chester knew about Dr. Durrani's prior issues.

260.     According to Dr. Tayeb, surgical notes were not being done timely and there are some "clinical ramifications."

261.     According to Dr. Tayeb, many times surgeries were performed in different areas than the work up.

262.     According to Dr. Tayeb, patients would not understand what Dr. Durrani was doing.

263.     According to Dr. Tayeb, Dr. Durrani loved to tell patients he would "fix" them.

60

264.    According to Dr. Tayeb, Dr. Durrani told patients they would be paralyzed.

265.    According to Dr. Tayeb, Dr. Durrani exaggerated the diagnosis of lumbar degenerative disc disease and stenosis.

266.    According to Dr. Tayeb, ER patients with back pain were referred to Dr. Durrani.

267.    According to Dr. Tayeb, he heard about West Chester facing financial challenges.

268.    According to Dr. Tayeb, he is of the opinion Risk Management knew about Dr. Durrani issues.

269.    According to Dr. Tayeb, Paula Hawk at a meeting with Dr. Durrani, Dr. Tayeb and Brian Gibler (CEO UC Health said: "We work with Dr. Durrani. We cater to Dr. Durrani, you know, to point where we want to try to expedite and make everything easy for you guys to bring everything over here." "He's our partner in crime."

270.    According to Dr. Tayeb, there were a suspicious high number of spine surgeries.

271.    According to Dr. Tayeb, Dr. Durrani bragged in the halls he was the top money maker.

272.    According to Dr. Tayeb, he's aware of at least one time four (4) surgery suites reserved at one time for Dr. Durrani.

273.    According to Dr. Tayeb, West Chester advertised they were a premier spine institute.

274.    According to Dr. Tayeb, there was a discussion about CAST and West Chester co-oping and Dr. Durrani wanted a "piece" of the action.

275.    According to Dr. Tayeb, there were $100 a day fines for records over 30 days late. He has no idea if Dr. Durrani was fined.

276.    According to Dr. Tayeb, Dr. Durrani went an entire six months—no records.

277. According to Dr. Tayeb, there were also issues of too long of days in surgery.

278. According to Dr. Tayeb, Dr. Durrani had two heart attacks and would get sick, go to ER get fluids and keep operating.

279. According to Dr. Tayeb, Dr. Tayeb believes Dr. Joseph had to have knowledge of the issues.

280. According to Dr. Tayeb, Dr. Durrani was super aggressive.

281. According to Dr. Tayeb, seen in clinic to surgery scheduling was for 30 patients 20-30% for Dr. Durrani.

282. According to Dr. Tayeb, others for 30- one or two scheduled.

283. According to Dr. Tayeb, Dr. Durrani would schedule surgeries without looking at MRI or ordering one.

284. According to Dr. Tayeb pertaining to Dr. Durrani, "I think it was just everything that was walking needed to be cut on in some way, shape or form whether it was necessary or not."

285. According to Dr. Tayeb, Defendants held discussions with Dr. Durrani regarding using 4th floor of hospital for CAST rehab.

286. According to Dr. Tayeb, lack of documentation effects patient care and West Chester responsible.

287. According to Dr. Tayeb, he heard the "paralyze" and "severe stenosis" to patients from Dr. Durrani a lot.

288. Elizabeth Dean was employed at West Chester Medical Center before they opened the doors for business.

289.     Elizabeth Dean was one of the original patient access representatives at West Chester Medical Center, which is now West Chester Hospital, beginning employment in February 2008 to July 2010.

290.     Elizabeth Dean had many responsibilities within the hospital including admitting Dr. Durrani patients and completing financial reports for the West Chester/UC Health CFO, Mike Jeffers.

291.     Elizabeth Dean was also included in most corporate meetings where discussions took place over the mass injections performed by Dr. Durrani in the testing area of the hospital and she also was the actual patient access representative who registered and spoke with all the Durrani patients.

292.     According to Elizabeth Dean, before Dr. Durrani began to practice at West Chester Hospital, every area of the hospital was a "ghost town."

293.     Despite being a new hospital, it was still not picking up revenue as it expected.

294.     Elizabeth Dean was required to ask for all copays when the patients arrived, just to "keep the numbers up" as much as possible.

295.     Elizabeth worked for five years as a medical biller with University Internal Medicine Associates before coming to West Chester.

296.     Elizabeth Dean knew West Chester/UC Health needed money based upon her position and work at West Chester.

297.     Elizabeth Dean reviewed the final numbers from CFO Mike Jeffers each month and also logged all payments received on the surgery cases including Dr. Durrani's.

298.     West Chester/UC Health's board and management gave staff raises based upon the hospitals financial woes.

299.     West Chester/UC Health fired the original CEO and corporate employees once the hospital was bought by UC Health, and appointed an ER physician as the new CEO, Kevin Joseph, MD.

300.     Elizabeth Dean will testify that West Chester/UC Health decided to have West Chester/UC Health ran by physicians.

301.     Vickie Scott worked at West Chester in the operating room during the time Dr. Durrani also worked there.

302.     OR Nurses, including Vickie Scott, went to the OR management, Elaine Kunko and Denise Evans and to Risk Management, Jill Stegman, about Durrani's illegal activities, deviations in standard of care and violations of policies, bylaws, regulations and rules. No action was taken. They complained and reported the same issues Gerry Goodman reported as previously described.

303.     Vickie Scott informed Elaine Kunko, OR assistant manager, about Dr. Durrani making the records appear that Dr. Durrani was doing all the procedures when they knew it was Dr. Shanti. Kunko did nothing to stop the Shanti Shuffle.

304.     Scott Rimer, circulating nurse at West Chester Medical Center, spoke up and complained about Dr. Durrani at an OR meeting with OR staff and hospital administration. Not only was Scott Rimer ignored, the next day he had his supervisor standing next to him watching his every move. He was fired soon after.

305.     safe.

306.     Those Gerry Goodman, Vickie Scott, Scott Rimer and other OR staff members complained to included Mitch McCrate, Jack Talbot, George Caralis, Kevin Joseph, MD, Melissa Hemmer, Elaine Kunko, Denise Evans, Jill Stegman, and David Schwallie. All

64

of these individuals are and/or were West Chester/UC Health management who communicated these complaints to the board. Many like Kevin Joseph, MD, President were on the board.

307.    West Chester/UC Health, its board and management, also knew of Dr. Durrani's sexual harassment of OR nurses and staff and ignored it.

308.    Melissa Dowler witnessed Dr. Durrani offer a nurse in the OR $10,000 for oral sex.

309.    Dr. Durrani had an affair with his staff member, Beth Garrett, who dropped out of nursing school, and like his relationship with a prior physician assistant at Children's Hospital, Jamie Moor it affected patient care.

310.    Dr. Durrani, by his deposition testimony, admits he relies upon his own reading of radiology. Of course, in this manner he would recommend a surgery the radiology did not support. The radiology department at West Chester, the director of radiology and all the radiologists privileged at West Chester from January 1, 2009 to June 1, 2013, knew Dr. Durrani was ignoring their radiology interpretations and did nothing to address the issue and/or were ignored when they tried to address the issue.

311.    Dr. Durrani, by his deposition testimony, admits he informs the pain doctor where to inject medicine. By doing so in the wrong place, he convinced many Plaintiffs to have repeat surgeries.

312.    Melissa Garrett is forty-one (41) years old, and is a pharmaceutical salesperson in Tampa, Florida. Melissa Garrett said her sister Elizabeth "Beth" Garrett who worked for Durrani/CAST.

65

313.    Melissa Garrett contacted counsel and stated that Beth Garrett was holding herself out as a nurse, although Beth Garrett had failed out of nursing school.

314.    Melissa Garrett stated that Beth Garrett had been present during surgeries by Dr. Durrani.

315.    She stated that Beth Garrett had improperly assisted in surgical procedures performed by Dr. Durrani without a nursing license.

316.    She stated that Beth Garrett had been improperly selling pharmaceutical products, without a license.

317.    She stated that Beth Garrett was having an "affair" with Dr. Durrani, and that she was concerned after Beth Garrett brought Dr. Durrani to her son's elementary school function and that the family "freaked out" in response to Beth Garrett and Dr. Durrani's conduct during the school function.

318.    Dr. Durrani prescribes a custom compound cream he sells to patients without informing them which he bills to their insurance and just sends to them.

319.    On information and belief Dr. Durrani owns some interest in this compound cream in a physician owned distributorship (POD) arrangement.

320.    Shauna O'Neal followed Gerry Goodman to West Chester as Director of Nursing.

321.    Shauna O'Neal came from Compass Clinical Consulting group in Cincinnati.

322.    Shauna O'Neal wrote a letter to Tom Daskalakis the COO of West Chester/UC Health, Kevin Joseph, MD, and the CNO in which in which she reiterated what Gerry Goodman reported regarding Dr. Durrani's OR bookings and Dr. Shanti's lack of credentials and/or privileges.  She was ignored.

323.     Thomas Kunkel, MD, anesthesiologist, complained to West Chester/UC Health's board and management about Dr. Durrani's high number of "add on" patients. He was ignored.

324.     According to Gerry Goodman, Dr. Durrani did add on patients at the last minute and after regular business hours so there was no one to preauthorize patients or question Durrani in any way regarding the surgery.

325.     Dr. Durrani always told Thomas Kunkel, MD the surgeries were emergencies.

326.     At times anesthesiology demanded the Chief of Surgery to intercede to judge whether or not it was emergent.

327.     Cindy Traficant was Periop Director before and after West Chester opened.

328.     When UC Health took over, Julie Holt, the original CNO, quit.

329.     Cindy Traficant became interim CNO.

330.     Cindy Traficant had a reputation of tolerating "bad" physicians.

331.     West Chester Surgery was nicknamed by staff at West Chester/UC Health the "island of misfit" doctors because they took in and tolerated any doctor no matter their ethics, including Dr. Durrani.

332.     OR staff collectively reported Dr. Durrani issues to West Chester/UC Health board and management and their complaints were ignored.

333.     Dr. Durrani would sometimes, because he was running behind, cancel part of a surgery or do only part of the surgery, thus requiring the patient to have another surgery, all without informing the patient the cancellation was because he was late.

334.     Dr. Durrani performed 159 surgeries at West Chester Medical Center in 2009; 534 in 2010; 536 in 2011; 437 in 2012; and 157 in 2013 for a total of 1,823 surgeries.

335.    West Chester/UC Health admitted in a discovery answer in the *Shell* case that for the investigation, background check and the information used to decide to grant Dr. Durrani privileges they relied upon in part:

- Dr. Durrani's education.

- Dr. Durrani's training and experience.

- Copies of his licenses and DEA numbers.

- Inquiry to the National Practitioners Data Bank.

- Evidence of required continued education.

336.    West Chester/UC Health refuses to provide under a claim of privilege all persons they consulted prior to permitting Dr. Durrani privileges.

337.    Dr. Durrani total **surgeries** performed as answered in a discovery in *Shell* at West Chester is as follows:

2009:  665

2010:  1908

2011: 1736

2012:  1102  (Through 9/30/12)

338.    Dr. Durrani admitted as **inpatient** based as answered in a discovery answer in *Shell* at West Chester is as follows:

2009:  154

2010:  488

2011:  507

2012:  305  (Through 9/30/12)

68

339.    Dr. Durrani admitted as outpatients based as answered in a discovery answer in *Shell* at West Chester is as follows:

2009: 13

2010: 41

2011: 45

2012: 35 (Through 9/30/12)

340.    West Chester/UC Health refuses to provide under a claim of privilege their investigation to determine Dr. Durrani's fitness to practice medicine prior to permitting Dr. Durrani privileges.

341.    West Chester/UC Health refuses to provide under claim of privileges, the instances where Dr. Durrani did not follow proper medical documentation protocol, policies and/or procedures at West Chester/UC Health.

342.    West Chester/UC Health refuses to provide under claim of privileges, the complaints made by employees, staff or patients related to Dr. Durrani.

343.    Dr. Durrani oftentimes used PureGen when performing surgeries, if this case involves PureGen, this is noted within this Plaintiff's specific factual allegations addressed earlier in this Complaint.

344.    PureGen has never been approved by the FDA for any human use. It's also now off the market for any use.

345.    West Chester/UC Health assisted Dr. Durrani in his use of PureGen at their facility.

346.    A representative from Alphatec Spine was in the operating room during medical procedures per the Nursing Intraop Records when Dr. Durrani used PureGen.

69

347. A representative from Alphatec Spine was in the operating room during medical procedures even when the Nursing Intraop Records do not indicate so.

348. Dr. Durrani was and is a paid consultant for Alphatec Spine.

349. Dr. Durrani has an ownership stake in the Alphatec Spine.

350. Dr. Durrani provided PureGen to patients who required surgery and those who did not require surgery without Plaintiffs knowledge and consent.

351. Dr. Durrani performed unnecessary surgeries using PureGen on his patients.

352. West Chester Hospital, UC Health and the Center for Advanced Spine Technologies knowingly created false medical records, bills, and cost reports that included charges for unlicensed uses of PureGen, which resulted in inflated outlier payments to be paid by the government and other insurers using the Plaintiffs' right to make a claim; or in the alternative, causing a false cost reports.

## TRIGGERS - RETENTION

353. With respect to Dr. Durrani, West Chester/UC Health did not follow their written medical staff policies and procedures under their professional practice evaluation policy.

354. West Chester/UC Health failed to follow the triggers for peer review from January 2009 through May 2013.

355. The following are the triggers for peer review or other actions as provided by West Chester/UC Health to the Deters Law Office in discovery in related litigation and is a list which by their own admission is not exclusive and is a list they produced after full knowledge of the items Dr. Keith Wilkey, Plaintiffs' experts, considered triggers:

    A. Wrong operative procedure performed

    B. Serious injury due to medical device

70

C. Procedure performed on wrong patient

D. Medication resulting in death

E. Delay in diagnosis

F. Autopsy not correlated with clinical diagnosis

G. Delay in treatment resulting in serious injury or death

H. Alleged abuse or neglect

I. Unexpected death

J. Surgical death

K. Mortality review

L. Unplanned second surgeon called to OR

M. MD not credentialed for procedure

N. Focus review

O. Incident reports

P. Contraindication to surgery

Q. Unintended retention of foreign object in a patient after surgery

R. Complications from procedure (i.e. readmits, infections, pneumothorax after procedure)

S. X-ray discrepancies

T. Returns to surgery

U. Transfusion not meeting criteria on order sheet

V. Change in surgery/procedure

W. Laceration/or perforation/puncture of organ during invasive procedure

X. Acute MI or CVA within 48 hours of procedure

Y. Anesthesia complications

Z. MD without timely response to ED or unit call

AA.     Risk management issues

BB.     Delay in treatment not resulting in serious injury and/or death

CC.     Delay in diagnosis not resulting in injury or death

DD.     Acute blood loss as indicated by procedure

EE.     Appropriate care measures not ordered

FF.     Readmission- complication of previous admission

GG.     Unplanned admission following surgery

HH.     72 hours returns to ED and readmit same issue

II.     Insufficient documentation

JJ.     Late dictation or no dictation of operative reports or discharge summaries

KK.     False claim of spondylolisthesis

LL. False claim of stenosis or its severity

MM.     Performing surgeries on patients whose health condition vitiates surgery: age, diabetes, obesity, hypertension, mental health issues, etc.

NN.     Shanti Shuffle- Dr. Shanti being forced to do an entire surgery for Dr. Durrani by Dr. Durrani without the patient's knowledge.

OO.     No hospital consents or improper CAST consents

PP. Failed Hardware

QQ.     Performing surgery not qualified to perform

RR.     Dura tear

SS. Having hardware which should be removed, which is never removed

TT. Ignoring radiology results

UU.        Misrepresentations to primary care physicians

356.        Dr. Keith Wilkey, a board certified spine expert, has reviewed over 213 patient

charts at West Chester of Dr. Durrani and signed 213 affidavits of merit as required under

CR10 of Ohio Rules of Procedure to file a medical malpractice case and based upon these

reviews over 500 events triggers place which would have required action against Dr.

Durrani by West Chester. Defendants intentionally took no action.

357.        In 2008, insurance companies became much more selective in what they would

authorize for payment. They started only paying for spinal surgeries that were highly

indicated, meaning there was rock solid medical evidence to support their necessity for

treatment of patients.

358.        Certain diagnoses such as spondylolisthesis and severe spinal stenosis have good

literature support for complicated lumbar fusion procedures with instrumentation, highly

indicated procedures with good outcomes which result in; more pay for Durrani. Dr.

Durrani would use these extensively. The data shows Dr. Durrani falsely claimed

spondylolisthesis diagnosis 95% of the time.

359.        Most of the surgeries Dr. Durrani actually performed were a lesser indication;

mainly degenerative disc disease with lesser amounts of spinal stenosis which insurance

companies will not usually pay for the more expensive spinal fusion; less pay for Dr.

Durrani. This is why Dr. Durrani would claim the conditions of spondylolisthesis.

360.        Surgeons have to obtain advanced authorizations from the patient's insurance

carrier prior to doing the surgery. If surgeons are requesting to do a surgery with a lesser

indication, most of the time it is denied unless the requesting surgeon can convince a

"peer surgeon" of the need to do the bigger surgery and demonstrate why this case is an exception to their policies. That takes time and the peer has access to the patient's whole medical record. That peer reviewer could easily have discovered the fraudulent diagnoses Durrani was claiming.

361.    Beginning in 2009, Dr. Durrani lied much more often to avoid the whole process and possibility of discovery by the insurance companies.

362.    Dr. Durrani didn't do his operative reports on time so as to assist his cover-up of the fraudulent diagnoses.

363.    Government has given hospitals incredible power to act as the "watch" for patient's safety and well-being, but with that power comes responsibility.

364.    West Chester Hospital had the duty to monitor its physicians via the peer review process and at least on paper, they had the process in place.

365.    In that process, West Chester had several "triggers" established which would have resulted in an in-depth peer review. Triggers don't have to be events or behaviors that are malpractice, but are designed to be even more sensitive.

366.    Most of those triggers are suggested by the government such as complications and return to surgery. However, hospitals are supposed to adjust their triggers for the individual physicians depending on their practice type and behaviors. This is to insure that the hospital has meaningful triggers for each physician. It wouldn't make sense to monitor operative reports for an internist that doesn't operate. It would make more sense to look at his discharge summaries.

367.    For Dr. Durrani, meaningful triggers would have been items tracked during the medical record review of the malpractice claims. Although complications such as

74

hardware failure, nonunion and revision are not mandated by the government for hospital triggers, any responsibility peer review committee should have reviewed Dr. Durrani's results and adjusted the triggers for Dr. Durrani to reflect his higher than normal complication rate in these areas. Other areas tracked should have included his off-label and contraindicated use of Infuse and PureGen.

368.    Defendants failed to act upon an overwhelming amount of material. There were over 591 individual triggers that were ignored by West Chester. That is overwhelming and unforgivable for a hospital to allow, given the power they had to protect their patients from harm.

369.    On peer review, they are asked to identify and assist with the removal of known incompetence. A surgeon's duty on the peer review panel is to protect patients from illegal operations. Surgeons look for false and fraudulent diagnoses plus fictitious medical treatment.

370.    The peer review committee is asked to sit on the committee for usually two years at a request.

371.    West Chester Hospital had bylaws based upon the joint commission accreditation of healthcare organizations known as "The Joint Commission." The principles of the initial credentialing that allowed Dr. Durrani to start operating and mechanisms available to the hospital to stop him from harming other patients a basically equivalent. There are some "minor" variations between state laws but for the most part, they are the same. An example would be the "process" called summary suspension, after it becomes clear of a physician's incompetence, the mechanism to remove him are the same everywhere. Therefore, the situation regarding West Chester and Dr. Durrani are unique only in their

75

depth and degree to which Dr. Durrani's egregious behavior was allowed to harm patients before he was stopped only by the filing of over one hundred lawsuits.

372.    The credentialing and peer review work is kept secret from the public.

373.    Credentialing is a very lengthy application where 40 to 100 pages of documents are required. Each of these have to be verified by the credentialing personnel from the hospital and then a committee member is assigned to do a further background check into these applicants past work to include calling references, hospitals and training programs.

374.    Within some broad limits, one can probe very deep into the past of an applicant because the applicant signs multiple disclosure agreements before the background check. This insures that if needed, the peer review can make good recommendations to the committee chairperson.

375.    Given Dr. Durrani's behavior and clinical problems in Cincinnati at the time he was applying for credentials at West Chester, phone calls should have been made regarding Dr. Durrani's past work history, particularly at Children's Hospital. Another "red flag" that Dr. Durrani would have had was the fact he was not board certified by the American Academy of Orthopedic Surgeons or a member of the North American Spine Society.

376.    Being board certified and a member of a specialty society is a good way for a hospital to have some external quality check for the applicant. If the applicant doesn't have those in their packet, it's a "red flag" and the reviewer for the committee has to be vigilant and do extra digging.

377.    If West Chester and Defendants had called and received reports not favorable to Dr. Durrani the information would be confidential and administration could still take a

76

chance and convince the physicians of the credentialing committee and MEC to allow the privileging anyway. Privileging under these circumstances is usually granted by the staff with very strict terms and the physician would be on a very "short leash."

378.　　　If this happens, the physician is put on a strict probationary period with any violation of the bylaws resulting in termination and databank report is filed.

379.　　　Dr. Durrani was incompetent and he should have had an immediate summary suspension and a National Practitioner's Databank report should have been filed after a fair hearing confirmed the initial suspension. This report would be the only way the public would know that Dr. Durrani was found to be incompetent by his peers at West Chester. This report did not happen and the hospital administration officers, Board members and Defendants were protecting Dr. Durrani from the usual process of peer review.

380.　　　The hospital administration has considerable control of the peer review process. They rightly claim the actual process of reviewing the patient's records and voting on the issue at hand is done by the hospital medical staff. The administration controls all the remaining variables; the physicians assigned to the committee are assigned to review the individual case, which physician is reviewed and the selecting "triggers" for the process and, the "assistants of the committee" that monitor physicians on a daily basis are all hospital employees.

381.　　　According to a review report of Dr. Durrani performed by Dr. Keith Wilkey, 8 of 16 patients OR reports were not done in a thirty day window, it included a lot of fictitious, fraudulent and false diagnoses, two contraindicated use of Infuse used in minors, one cancer after Infuse and several novel surgeries—VATS, AxiaLIF, DLIF.

The results of this peer review speak for itself. Had this study been completed, there is no way to conclude otherwise that Dr. Durrani was incompetent. He should have been summarily suspended before the study was done to protect future patients. The peer review should have reported to the MEC and then Dr. Durrani should have been suspended until a hearing at the MEC level confirmed or denied the summary suspension. A databank report would have been required to be filed by West Chester.

382.     West Chester's bylaws clearly state the requirement that OR reports be done within 30 days from the completion of the surgery. Without exceptions, physicians get written notification of their delinquent records and are given anywhere from seven to ten days to correct the deficiency. If the charts are not dictated within that time limit, the physician is summarily suspended and the case is sent to the MEC for their review. This process may be repeated one or two more times, but usually within a six month period, the delinquent physician has their privileges revoked and a databank report filed. Dr. Durrani was given an exception for over four years.

383.     Defendants willingly overlooked illegal operations. Dr. Durrani gave false or exaggerated and fraudulent diagnoses plus fictitious medical treatment. His surgical outcomes were horrible.

384.     The hospital has to disclose the OR reports and the report included the time and the date of the dictation, to which the delay from the surgery date can be determined. West Chester had to disclose emails between the hospitals and Dr. Durrani. In one email from the CEO, Defendant Joseph to Dr. Durrani, the CEO acknowledges that they knew of Dr. Durrani's dictation violations. Therefore, they had actual knowledge of Dr.

78

Durrani's violations and cannot claim a statutory presumption of immunity from negligent credentialing.

385. The Joint Commission sets the standard and hospital compliance isn't controlled by the state. Hospitals have to have ongoing physician monitoring in place to satisfy the accreditation requirements. Good hospitals require a medical staff that is willing and able to monitor itself through Practitioner Performance—ongoing professional practice evaluation "OPPE."

386. Since 2009, the Joint Commission has required hospitals, through its medical staff, to conduct an ongoing professional practice evaluation of every privileged practitioner at the hospital, without exception. There are three essentials to OPPE: it must measure certain things (for surgeons, surgical complications and treatment patterns), the measures must be collected and assessed (periodic chart review, observation, discussion with other doctors and nurses), and finally the medical staff must act on its findings (focused professional performance evaluation instituted.) It is a confidential process.

387. Due to the confidentiality, Dr. Durrani's OPPE from the hospital is not available but because West Chester is joint commission accredited and they supposedly meet all their requirements, it is safe to conclude the OPPE process was done two or three times on Dr. Durrani. Once he started at West Chester and then before his re-credentialing every two years. He either resigned, did not reapply, or was revoked around his four year re-credentialing.

388. There is another instance where West Chester administration should have known about the other Dr. Durrani issue in that if the OPPE found problems, the MEC should

79

have required a FPPE, which is an in-depth review with the possible requirement for corrective action, summary suspensions, and recommendation of limitation or termination of privileges. If a FPPE was ongoing and Dr. Durrani resigned during this process, a Databank report should have been filed, which didn't happen.

389.     Anytime an event occurs that is significant, called a "trigger" OPPE or an FPPE can be conducted, and given Dr. Durrani's poor performance that should have occurred given a medical staff that was diligent in their duties. The administration had multiple warnings from the medical staff about Dr. Durrani. They knew he was bad and ignored that fact.

## DR. DURRANI COUNTS:

## COUNT I: NEGLIGENCE

390.     Defendant Dr. Durrani owed his patient, Plaintiff, Robert Mounce, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

391.     Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

392.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

80

## COUNT II: BATTERY

393.     Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, using Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

394.     Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

395.     As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

396.     The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani.  Dr. Durrani and CAST each required an informed consent release.

397.     In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

398.     Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with his surgeries and procedures.

399.     Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

400.     As a direct and proximate result of the lack of informed consent, Plaintiff

sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

401.     Dr. Durrani's conduct as described above was intentional and reckless.

402.     It is outrageous and offends against the generally accepted standards of morality.

403.     It was the proximate and actual cause of Plaintiff's psychological injuries,

emotional injuries, mental anguish, suffering, and distress.

404.     Plaintiff suffered severe distress and anguish so serious and of a nature that no

reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

405.     Dr. Durrani made material, false representations to Plaintiff and their insurance

company related to Plaintiff's treatment including: stating the surgeries were necessary,

that Plaintiff would need a spinal fusion eventually, that more conservative treatment was

unnecessary and futile, that Plaintiff would be walking normally after swelling went

down, that the procedures were medically necessary and accurately reported on the

billing to the insurance company, that the surgery was successful, and that Plaintiff was

medically stable and ready to be discharged.

406.     Upon information and belief, Dr. Durrani may have never been licensed to

practice medicine.

407.     These misrepresentations and/or concealments were material to Plaintiff because

they directly induced Plaintiff to undergo her surgery.

82

408.     Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

409.     Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

410.     The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

411.     Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

412.     As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

**COUNT VI: SPOLIATION OF EVIDENCE**

413.     Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

414.     Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

415.     Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

416.     At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

417.     Dr. Durrani is in fact, the owner of CAST.

418.     Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

419.     Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

420.     Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

421.     As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

422.     CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

423.     Upon information and belief, Dr. Durrani may have never been licensed to practice medicine.  CAST breached its duty to Plaintiff, inter alia, by not properly credentialing Dr. Durrani.

84

424.     CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

425.     The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

426.     Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

427.     As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: SPOLIATION OF EVIDENCE

428.     CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

429.     CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

430.     CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

431.     Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

85

432.     CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

433.     CAST omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

434.     CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

435.     CAST was fully aware of its actions.

436.     CAST was fully aware that Plaintiffs were induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiffs.

437.     Had Plaintiffs been aware that CAST's representations as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

438.     CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

439.     CAST's actions were not the result of any bona fide errors.

440.     As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiffs have suffered and continues to suffer damages, which include, but are not limited to the following:

a.   Loss of money paid

b.   Severe aggravation and inconveniences

c.   Under O.R.C. 1345.01 Plaintiffs are entitled to:

86

i.  An order requiring that CAST restore to Plaintiffs all money received from Plaintiffs plus three times actual damages and/or actual/statutory damages for each violation;

ii.  All incidental and consequential damages incurred by Plaintiffs;

iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

441.    West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

442.    West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

443.    The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

444.    The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's

87

knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

445.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION**

446.     As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

447.     West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

   a.   Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

   b.   Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

   c.   Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

   d.   Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's

Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

448.     The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

449.     As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT III: FRAUD

450.     West Chester Hospital/UC Health either concealed from Plaintiff facts they knew about Dr. Durrani's mispresentations, or misrepresented to Plaintiff the nature of the surgery and that it was unnecessary, and the particular risks that were involved therein.

451.     Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

452.     West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

453.     As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

454. West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

455. West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

456. West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: OHIO CONSUMER SALES PRACTICES ACT

457. Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

458. West Chester Hospital/UC Health's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

459. West Chester Hospital/UC Health omitted suppressed and concealed from Plaintiffs facts with the intent that Plaintiffs rely on these omissions, suppressions and concealments as set forth herein.

460. West Chester Hospital/UC Health's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive

and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to

Substantive Rules and case law.

461.    West Chester Hospital/UC Health was fully aware of its actions.

462.    West Chester Hospital/UC Health was fully aware that Plaintiffs were induced by

and relied upon West Chester Hospital/UC Health's representations at the time West

Chester Hospital/UC Health was engaged by Plaintiffs.

463.    Had Plaintiffs been aware that West Chester Hospital/UC Health's representations

as set forth above were untrue, Plaintiffs would not have used the services of Defendants.

464.    West Chester Hospital/UC Health, through its agency and employees knowingly

committed the unfair, deceptive and/or unconscionable acts and practices described

above.

465.    West Chester Hospital/UC Health 's actions were not the result of any bona fide

errors.

466.    As a result of West Chester Hospital/UC Health's unfair, deceptive and

unconscionable acts and practices, Plaintiffs have suffered and continues to suffer

damages, which include, but are not limited to the following:

    a.   Loss of money paid

    b.   Severe aggravation and inconveniences

    c.   Under O.R.C. 1345.01 Plaintiffs are entitled to:

        i.   An order requiring West Chester Hospital/UC Health restore to Plaintiffs

            all money received from Plaintiffs plus three times actual damages

            and/or actual/statutory damages for each violation;

        ii.   All incidental and consequential damages incurred by Plaintiffs;

91

iii. All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1. Past medical bills;

2. Future medical bills;

3. Lost income and benefits;

4. Lost future income and benefits;

5. Loss of ability to earn income;

6. Past pain and suffering;

7. Future pain and suffering;

8. Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9. Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10. All incidental costs and expenses incurred as a result of their injuries;

11. The damages to their credit as a result of their injuries;

12. Loss of consortium;

13. Punitive damages;

14. Costs;

15. Attorneys' fees;

16. Interest;

17.     All property loss;

18.     All other relief to which they are entitled including O.R.C. 1345.01

19.     Based upon 1-18 itemization of damages, the damages sought exceed the minimum

jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

20.     Plaintiff also demands declaratory judgment as to the unconstitutionality of O.R.C.

§2305.113(C) to the extent that it applies to this action.


Respectfully Submitted,


Matt Hammer(#0092483)
Lindsay Boese(#0091307)
The Deters Law Firm
5247 Madison Pike
Independence, KY 41051
Ph: (859) 363-1900
Fax: (859) 363-1444
mhammer@ericdeters.com
lboese@ericdeters.com
*Counsel for Plaintiffs*


**JURY DEMAND**


Plaintiff makes a demand for a jury under all claims.


Matthew Hammer (#0092483)


93

**ROBERT MOUNCE**
**AFFIDAVIT OF MERIT**
**WEST CHESTER**

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 200 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges. I have also reviewed binders provided by the Deters Law Firm which they provided to defense counsel.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Robert Mounce and the medical treatment of Robert Mounce at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

1

11. I have also reviewed the nursing summary prepared by legal counsel's office for Robert Mounce. Based upon the number of cases I've reviewed pertaining to Dr. Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the **facts** I rely upon:

A. Surgery plans were not necessary at the time. Based on review of client records and imaging. The client a 30 y.o. male at the time, was seen by Dr. Durrani for complaints of severe back pain in the lower lumbar region with pain going into the left buttock, and numbness and tingling in the left leg. He was status post MVA on 06/03/2009, where he complained of LOC, left elbow, low back, and left ankle pain. He was seen at St. Luke Hospital where a CT of the abdomen was obtained and discharged to home with pain medication and muscle relaxants. He followed up with his PCP due to increased back pain, as well as Dr. Iannelli for Chiropractic evaluation. He was then seen by Dr. Michael Dragan with Summit Medical Group, who referred him to Dr. Durrani. On 06/14/2011 the client was first seen by Dr. Durrani. An MRI was ordered and upon review of the imaging on client second visit dated 06/28/2011. Dr. Durrani recommended a Hemilaminotomy, foraminotomy bilaterally at the L4-L5 and the L5-S1 levels. Aside from the fact Dr. Durrani's interpretation of the imaging is more severe than that of the radiologist. Dr. Durrani fails to educate the client on the importance of reasonable outcomes, and the importance of exhausting all conservative means of treatment before moving on to more aggressive means such as surgery. Dr. Durrani should have reviewed the clients records more thoroughly. Dr. Durrani provides no history of the onset of clients symptoms, or prior back problems. Dr. Durrani's operative indications do not provide sufficient documentation to support the medical necessity for the surgery. Further studies should have been done as well as more attempts at conservative treatment before any surgery was recommended.

B. Dr. Durrani's misinterpretation of the pre-operative diagnostic:

Noted per Radiologist review of MRI of lumbar spine w/o contrast dated 06/17/2011. At the L5-S1 level, there is concentric bulging of the disc without evidence of focal disc herniation or central spinal stenosis. There is facet arthropathy. The degenerative disc disease and facet arthropathy produce mild bilateral L5-S1 foraminal stenosis.

2

The L4-L4 level shows concentric bulging of the disc without evidence of focal disc herniation or central spinal stenosis. There is facet arthropathy. The neural foramina are patent. The L3-L4 level shows mild degenerative disc disease without evidence of focal disc herniation or central spinal stenosis. The neural foramina are patent.

On client second visit dated 06/28/2011. Dr. Durrani states in his review of the MRI dated 06/17/2011. The MR shows he has three-level disk degenerative disease at L3-L4, L4-L5, and L5-S1. The most significant one is the L4-L5 and L5-S1. At the L5-S1 he has a complete foraminal stenosis bilaterally. At the L4-L5 he has about an 85% severe foraminal stenosis. At L3-L4 about 50% foraminal stenosis, at 2-3 the foramina become normal.

C. Surgery was recommended on the client's second office visit with Dr. Durrani at CAST dated 06/28/2011.

D. The client had one surgery by Dr. Durrani dated 10/31/2011 at West Chester Hospital.
   PROCEDURES: Lumbar laminectomy L4-L5.
                   Lumbar laminectomy L5-S1.
                   Bilateral foraminotomies L4-L5.
                   Bilateral foraminotomies L5-S1 using Baxano.

   PREOPERATIVE AND POSTOPERATIVE DIAGNOSES:
                   Lumbar spinal stenosis L4-L5 and L5-S1.
                   Bilateral foraminal stenosis, L4-L5 and L5-S1.
                   Degenerative lumbar spondylolisthesis, L4-L5 and L5-S1.

E. Client had no hardware or BMP used in his surgery.

F. The operative report for client surgery dated 10/31/2011 at West Chester Hospital was dictated by Dr. Durrani on 02/04/2012 at 09:34.

G. The client has seen the following subsequent treating physicians:
   The client continues to see his family Physician Dr. Stewart. Dr. Stewart referred the client to Dr. Bradley Mullen with St. Elizabeth Spine Center.

   The client has been seen by Dr. Bradley Mullen with St. Elizabeth Spine Center 4900 Houston Rd. Florence, KY. 41042-4824 (859) 212-7000. In a interview with the client, this was the first Physician who told him he should have never had the surgery after reviewing his records and pre and post operative imaging.

The client is currently seeing Dr. Michael Rohmiller with Beacon Orthopedics 600 rodeo Dr. Erlanger, KY. 41018 (888) 773-4353. He is going to PT twice a week and states Dr. Rohmiller also stated after reviewing his pre and post operative records he should have never had the surgery. The client also states he continues treatment with his Chiropractor,

Dr. Heather Iannelli The Children's Family Chiropractic Center 1856 Ashwood Cir. Fort Wright, KY. 41011. (859) 331-8000.

H. The client continues to complain of the same pain as prior to surgery. Severe low back pain, groin pain, and numbness in his legs. The client continues to be seen By Dr. Michael Rohmiller for pain management and further evaluation. He is on Norco for pain which he states he has on a daily basis of varying degrees dependent on his level of activity.

I. The client continues to have pain on a daily basis. He was currently laid off from his job due to continued appointments with his physicians and problems with his back. He stated his pain varies dependent on activities. He takes pain medication daily to help but, continues to have problems. He is going to his Chiropractor and Dr. Michael Rohmiller with Beacon Orthopedics, and is scheduled for Physical therapy twice a week. He has trouble with long car rides, walking for long periods of time, as well as anything that requires bending or lifting. He states he does not just have physical problems but, is afraid of doing a lot of things not only around the house, but outside as well. He is afraid of further damaging his back as well as the pain getting worse than it already is. He wishes he had never had the surgery because of the affect it has had on his life.

13. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

A. Need to have additional surgery to repair problems created by Dr. Durrani

B. Implantation of Puregen without informed consent

C. Implantation of BMP-2 without informed consent

D. Failed hardware

E. Failure to obtain proper informed consent for surgery

F. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

4

G.  Failure to properly post-op monitor the patient

H.  Failure to properly perform follow up, post-op care

I.   Negligent surgical techniques

J.   Failure to maintain accurate and complete surgical records and surgical consent forms

K.  Failure to disclose important health information to patient

L.   Failure to maintain and complete discharge summary

M.  Failure to supervise Dr. Durrani

N.  Negligent pre-surgical diagnosis

O.  Failure to prepare a timely operative report or other medical record

P.   Billing for services not completed

Q.  Not informing the patient another surgeon will be doing all or part of the surgery

R.   Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

S.   Deviation in standard of care

T.   Failure to perform thorough and accurate pre-op nonsurgical evaluation

U.  Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

V.  Failure by CAST to disclose additional/changed procedure and reason to patient

W.  Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

X.  Prior knowledge of possible complication and not acting properly upon same

Y.  Failure to disclose pertinent health information to another health care provider

Z.  Fraudulent, negligent and reckless pre-operative work up

5

AA.    Fraudulent, negligent and reckless surgery

BB.    Inaccurate, fraudulent, and/or exaggeration of diagnoses

CC.    Failure to properly educate patient regarding diagnoses

DD.    Failure to attempt non-surgical conservative treatment

EE.    Failure to perform thorough and accurate pre-op nonsurgical evaluation

FF. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

GG.    Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

HH.    Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

II.    Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

JJ. Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

KK.    Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

LL. Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

MM.    Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

NN.    Failure by UC/West Chester Health to supervise staff

OO.    Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

PP. Non-approved hardware combinations

QQ. Dr. Durrani made false and material misrepresentations of material facts intended to mislead Robert Mounce and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. Robert Mounce was justified in relying on the misrepresentation and did rely proximately causing harm to Robert Mounce.

6

Dr. Durrani, CAST, and UC/West Chester Health intentionally misled Robert Mounce. Robert Mounce had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

15. Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr.

Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

8

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing. (Despite what his bylaws state.)

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

9

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

10

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

11

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries

including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support Robert Mounce's claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, Robert Mounce suffered damages proximately caused by them, including the following:

    A. Permanent disability
    B. Physical deformity and scars
    C. Past, Current and Future Physical and Mental Pain and Suffering
    D. Lost income past, present and future
    E. Loss of enjoyment of life
    F. Past medical expenses
    G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
    H. Aggravation of a pre-existing condition
    I. Decreased ability to earn income
    J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.

NOTARY

13

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___12___ day of ~~March~~ *May* 2015.

_Angela Poinsette_
NOTARY PUBLIC
My Commission Exp.: 07|18|2015
St. Charles County

State of _Missouri_

> ANGELA POINSETT
> Notary Public - Notary Seal
> State of Missouri
> Commissioned for St. Charles County
> My Commission Expires: July 18, 2015
> Commission Number: 11133613

14